# SUPREME COURT,

## STATE OF KANSAS.

## JANUARY TERM, 1904.

*PRESENT:*

Hon. WILLIAM A. JOHNSTON, Chief Justice.
Hon. WILLIAM R. SMITH,
Hon. EDWIN W. CUNNINGHAM,
Hon. ADRIAN L. GREENE,
Hon. ROUSSEAU A. BURCH, } Justices.
Hon. HENRY F. MASON,
Hon. WILLIAM D. ATKINSON,

The State of Kansas v. The American Book Company *et al.*

**13,348.** (76 Pac. 411.)

SYLLABUS BY THE COURT.

1. Foreign Corporations — *Contracts Made Before Compliance with the Statute.* Contracts made with a foreign corporation before it has obtained permission under the provisions of chapter 10, Laws of 1898, and chapter 125, Laws of 1901 (Gen. Stat. 1901, § 1259, *et seq.*), to do business in this state are not for that reason invalid or subject to cancelation at the suit of one of the contracting parties.

2. ———— *Regulation by the State, and Not by a Citizen.* The regulation of foreign corporations under the statutes referred to devolves upon the state, and a private individual is not allowed to interfere except in the single instance of a failure by the corporation to file its annual statement, and then only to the extent of abating a suit against him until the required statement shall have been filed.

3. ———— *When Injunction Will Not Lie.* After a foreign corporation has complied with the law and has received permission

1—69 KAN.

to do business in the state, it cannot be enjoined at the suit of the state from performing contracts made before such permission was obtained.

4. ——— *Negotiation with State School-text-book Commission Distinguished.* The negotiation of a foreign corporation with the state school-text-book commission, resulting in a contract and bond to supply the public schools with text-books, does not constitute the doing of business within the state by such corporation, within the meaning of the statutes cited in the first paragraph of this syllabus.

Error from Shawnee district court; Z. T. HAZEN, judge. Opinion filed April 9, 1904. Affirmed.

*Otis E. Hungate, G. C. Clemens,* and *Quinton & Quinton,* for The State.

*Rossington, Smith & Histed,* and *H. J. Bone* and *Hite & Nichols,* as *amici curiæ,* for defendants in error.

The opinion of the court was delivered by

BURCH, J.: In the year 1897 the legislature passed an act relating to text-books for use in the public schools of this state, providing for state uniformity and maximum charges for such books, and creating a commission to select them. This act was amended and supplemented at the sessions of 1898 and 1901. The commission thus created consists of eight members, and to enable it to select and adopt uniform series of school text-books for use in the public schools it is authorized and empowered to advertise for receive, open, pass upon, and accept bids, and upon such acceptance to enter into definite and binding contracts with bidders for the furnishing of such text-books.

In the year 1898 the legislature passed an act, which it amended in certain particulars in 1901, providing methods whereby corporations organized un-

der the laws of other jurisdictions seeking to do business in this state may be permitted to do so. The procedure for the purpose of obtaining such permission is practically the same as that for obtaining a domestic charter. The foreign corporation desiring it must file an application therefor, setting forth the following information :

"1st. A certified copy of its charter or articles of incorporation. 2d. The place where its principal office or place of business is to be located. 3d. The full nature and character of the business in which it proposes to engage. 4th. The names and addresses of the officers, trustees or directors and stockholders of the corporation. 5th. A detailed statement of the assets and liabilities of said corporation, and such other information as the board may require in order to determine the solvency of the corporation." (Laws 1898, ch. 10, § 2 ; Gen. Stat. 1901, § 1260.)

The application must be accompanied by a fee, and, as a condition precedent to the granting of the application, the corporation must file its irrevocable written consent submitting itself to the jurisdiction of the courts of this state. A charter board passes upon the application, and if it be granted the corporation is required to pay certain additional fees and to file with the secretary of state a certified copy of its charter. In passing upon the application the charter board is required to make special inquiry with reference to the solvency of the corporation. All corporations doing business in the state are required to file annual statements disclosing varied information regarding their composition, organization, and business. The failure to file such statement within a given period works a forfeiture of the right to do business, which the charter board may ascertain, declare, and publish.

The statute (Laws 1898, ch. 10, § 12; Gen. Stat. 1901, § 1283) further provides :

"No action shall be maintained or recovery had in any of the courts of this state by any corporation doing business in this state without first obtaining the certificate of the secretary of state that the statements provided for in this section have been properly made."

Foreign corporations admitted to do business in this state are made subject generally to the same judicial control, restrictions and penalties as those organized under the laws of this state.

Prior to the 31st day of May, 1902, the American Book Company, a corporation of the state of New Jersey, complied with the corporation law described in all particulars except those relating to the payment of fees. The state authorities at that time interpreted the law in a manner exempting foreign corporations already doing business in the state from the payment of the prescribed fees, and the book company fell within that category. It filed its annual report and received a certificate of the secretary of state to that effect.

On May 31, 1902, the book company entered into three contracts with the state school-text-book commission to supply the schools of the state with certain text-books, and gave bond for the performance of the obligation it assumed, as the text-book law required. These contracts were made in consummation of accepted bids submitted to the commission on May 5, 1902, pursuant to advertisement therefor. On June 7, 1902, an action of *quo warranto* was commenced in this court against the book company, which on July 21, 1902, resulted in a judgment ousting it from doing business in the state on account of failure to comply fully with the statutes governing its admission to

the state. (*The State v. Book Co.*, 65 Kan. 847, 69 Pac. 563.) On August 5, 1902, the book company complied with the law in all respects, and was duly admitted to do business in the state.

On August 18, 1902, this action was brought in the district court of Shawnee county in the name of the state for the cancelation of the contracts the book company had made. At that time the book company had partially performed those contracts, and was proceeding to a full discharge of its obligations under them. On September 2, 1902, a temporary injunction against further performance of the contracts was refused, and the state, by this proceeding in error, seeks a reversal of that order.

To secure an injunction the state relied upon the failure of the book company to comply with the law before entering into the contracts assailed and the judgment of ouster. The decision in the case of *The State v. Book Co.*, supra, did nothing more than determine that for a non-compliance with the law relating to its admission into the state the book company should be ousted from its claimed right to do business in the state until it should have complied with the requirements of that law. The naked question, therefore, remains—Are the contracts referred· to now subject to cancelation because made before the book company had been admitted to do business in this state ?

The question of capacity to contract is not involved on either side of the case. The book company and the text-book commission each possessed every qualification necessary to bind by contract. By the laws of their creation and organization they were each endowed with this faculty. The case is not like one in which the ability to invest an agreement with any

engaging quality is altogether withheld, nor is it like one in which the limits of some agency have been transgressed. There is here no lack of capability, no defect of power, and no deficiency of authority. The only question is whether power may be effectually displayed as against the provisions of the corporation law.

The statute describes itself as an act "providing for the regulation of foreign corporations and the method by which they may be permitted to do business in this state," and it purports to cover that entire field. It prevents the exercise of corporate franchises in this state with respect to matters for which citizens of this state cannot incorporate, prevents concerns which are morally and financially irresponsible and untrustworthy from freely invading the state and imposing upon its citizens, and subjects foreign companies to the jurisdiction of local authorities. Official supervision of these affairs is committed to a state board. Such affairs, however, relate to nothing but the character and condition of the corporation itself. They are all enumerated in the statements of the application for admission and in the annual reports. There is no intimation of any purpose whatever to interfere in the relations between the corporation and the citizen. Business between them is as unregulated as it is between natural persons. Nor does the statute in terms prohibit foreign corporations from doing business in this state, or avow any purpose to deny the people the benefit of commercial intercourse with them. Indeed, under its title, the statute could not extend beyond regulation. It prescribes no penalty whatever for failure to obtain permission to do business here. It makes no reference whatever to any effect which such failure may have

upon the title to property acquired, contracts made, or other incidents to the doing of business. It does not anywhere use the terms "unlawful," "illegal," or "void," or any equivalent for them, as applied to the transaction of business without authority. It does not declare any determination whatever to reach beyond the offending company and nullify wholesome business bargains in matters of lawful trade. Foreign corporations may be supervised but business is not proscribed.

This treatment of the subject did not follow, however, from any oversight on the part of the legislature with reference to the use of penalties. In the case of failure to file annual statements, the charter board is authorized to ascertain and summarily declare and publish a forfeiture of the right to do any further business, which forfeiture becomes immediately effective; and the right of any corporation doing business in the state to sue or recover in the courts is made to depend upon the ability to obtain a certificate of the secretary of state that section 12 of the law has been observed. The noteworthy feature of the last-mentioned provision is that it creates a field for the intervention of the citizen in the matter of corporate regulation. While contracts are not invalidated, the binding force of obligations impaired, or the doing of business forbidden, the citizen is allowed to interpose a bar to any relief until the proper certificate can be produced.

From this survey of the statute it appears that the legislature intended it to be complete; that the regulation of foreign corporations, and not the penalizing of business transactions, is its purpose; that such regulation is made the concern of the state in its special capacity as visitor, and not of any individual

as a mere party to a contract; that a party to a contract is allowed to interfere in but a single instance, and then only to the extent of abating a suit against him; and that specific penalties are chosen to meet certain contingencies. The conclusion obviously and naturally follows that the legislature intended the state to rely upon the common-law remedies for the enforcement of the statute where none other was expressed; that the courts have no authority to interpolate in the law provisions concerning which the legislature, with all the resources of the English language at its command, remained silent, or to annex penalties for a violation of the law which the legislature, with a great arsenal to choose from, failed to mention. Hence contracts made with a foreign corporation before it has obtained permission to do business in the state are not, for that reason, invalid or subject to cancelation.

This statute was interpreted by the United States circuit court of appeals of this circuit in the case of *Blodgett v. Lanyon Zinc Co.*, 120 Fed. 893, 58 C. C. A. 79, decided in February, 1903. A suit in equity was brought by the privies of a party to a contract to cancel it because made with a foreign corporation which had not obtained permission to do business in the state. In affirming a decree denying the relief sought the court said:

"It is also worthy of notice that there is no provision of the statutes of Kansas prohibiting a foreign corporation from doing business in that state, or declaring that any act or contract of a foreign corporation that fails to comply with the requirements to enable it to obtain permission to do business from the charter board shall avoid any of its acts or contracts. Conceding that the Lanyon Zinc Company had not complied with the corporation laws of Kansas so as

to entitle it to permission from the charter board to do business in that state, no reason occurs to us why this fact should be held by the courts to avoid its contracts or the effect of its acts in performance of its agreements, in the absence of the denunciation of any such penalty for the failure to comply with its statutes by the legislature of the state which made them.   On the other hand, there are two established and familiar rules of law which prohibit the complainants from availing themselves of the failure of their lessee to comply with the statutes authorizing it to do business in the state for the purpose of escaping from the performance of their obligation under their contract.   One is that the laws relative to the admission of foreign corporations to do business in the state of Kansas were not enacted for the purpose of destroying contracts or prohibiting their performance.   It was not the intent or purpose of the legislature by these laws to regulate the agreements of foreign corporations with the citizens of the state of Kansas, or to supervise or prohibit the performance of their contracts.   The object of these statutes was to subject foreign corporations doing business in the state to the jurisdiction of its courts, and to the inspection and supervision of its officers, not to the end that the citizens of the state might avoid their contracts and perpetrate injustice, but to the end that justice might be administered to both the corporations and the citizens.   Hence it is that the private citizen is not the party empowered to enforce these corporation laws, nor is the nullification of his contracts or of acts done in performance thereof the true remedy for their violation.   The state alone is authorized to enforce them, and the ouster and dissolution of the corporation, or an injunction against its proceedings at the suit of the state, is the only remedy available. . . .   The second rule is that where a contract or an act in performance of it is not *malum in se*, and its invalidity is not declared as a penalty for a violation of a statute, the courts may not declare it, and thus affix a penalty not prescribed by the lawmaking

power. . . . There was no provision in these statutes which inflicted the penalty of the invalidity of contracts made, or business done, without a compliance with them, nor was there any express prohibition of the conduct of such business before the laws were complied with. As there was nothing morally wrong in the acts of the appellee, as it was not the primary purpose of the statutes under consideration to invalidate such acts or contracts, and as the statutes contain neither express provision nor clear intimation that this was the intent of the legislators, it is not the province of the courts to do so. While the authorities on this question are variant and conflicting in the state courts, the federal courts have steadily adhered to the rule, which is sustained by the better reason and the more persuasive opinions in the courts of the states, that, in the absence of an express provision of statute to the contrary, the innocent contracts and acts of a foreign corporation which has failed to comply with the statutes permitting it to do business in the state where the contracts are made and the acts are done are, nevertheless, valid and enforceable, because it is not the intent of the authors of such laws to strike down such agreements and acts when they are not evil in themselves.''

Authorities sustaining these views are abundant: *Fritts v. Palmer*, 132 U. S. 282, 10 Sup. Ct. 93, 33 L. Ed. 317.; *Harris v. Runnels*, 12 How. 79, 13 L. Ed. 901; *National Bank v. Matthews*, 98 U. S. 621, 25 L. Ed. 188; *National Bank v. Whitney*, 103 id. 99, 26 L. Ed. 443; *Smith v. Sheeley*, 12 Wall. 358, 361, 20 L. Ed. 430; *State &c. Ins. Ass. v. Brinkley Stave &c. Co.*, 61 Ark. 1, 31 S. W. 157, 29 L. R. A. 712, 54 Am. St. Rep. 191; *Sherwood v. Alvis*, 83 Ala. 115, 3 South. 307, 3 Am. St. Rep. 695; *Kindel v. Lithographing Co.*, 19 Colo. 310, 35 Pac. 538, 24 L. R. A. 311; *Ray v. Home & Foreign Co.*, 98 Ga. 122, 26 S. E. 56; *The Phenix Insurance Co. v. The Pennsylvania Railroad Co.*, 134 Ind. 215, 33 N. E. 970, 20 L. R. A. 405; *Ehrman v. Teu-*

*tonia Ins. Co.*, 1 McCrary (D. C.) 123, 1 Fed. 471;
*Tolerton & Stetson Co. v. Barck*, 84 Minn. 497, 88 N.
W. 10 ; *Clark v. Middleton & Riley*, 19 Mo. 53 ; *Chicago
Mill & Lumber Co. v. Sims*, 101 Mo. App. 569, 74 S. W.
128 ; *King v. National M. & E. Co.*, 4 Mont. 1, 1 Pac.
727 ; *M. B. L. Ins. Co. v. Winne*, 20 id. 20, 49 Pac. 446 ;
*Steam Navigation Co. v. Weed*, 17 Barb. 378 ; *Washburn
Mill Company v. Bartlett*, 3 N. Dak. 138, 54 N. W. 544 ;
*Union Mutual Life Insurance Co. v. McMillen*, 24 Ohio
St. 67 ; *Wright v. Lee et al.*, 2 S. Dak. 596, 51 N.
W. 706 ; *Niemeyer and als. v. Wright*, 75 Va. 239, 40
Am. Rep. 720 ; *Toledo T. & L. Co. v. Thomas*, 33 W.
Va. 566, 11 S. E. 37, 25 Am. St. Rep. 925 ; *Dearborn
Foundry Co. v. Augustine*, 5 Wash. 67, 31 Pac. 327 ;
*Edison etc. Co. v. Navigation Co.*, 8 id. 370, 36 Pac. 260,
24 L. R. A. 315, 40 Am. St. Rep. 910.

In the case of *Fritts v. Palmer*, supra, the supreme
court of the United States dealt with the question in-
volved as follows :

"The constitution and laws of Colorado, it should
be observed, do not prohibit foreign corporations
altogether from purchasing or holding real estate
within its limits. They do not declare absolutely or
wholly void, as to all persons, and for every purpose,
a conveyance of real estate to a foreign corporation
which has not previously done what is required be-
fore it can rightfully carry on business in the state.
Nor do they declare that the title to such property
shall remain in the grantor, despite its conveyance.
So far as we are aware, the only penalty imposed by
the statutes of Colorado upon a foreign corporation
carrying on business in the state before acquiring the
right to do so, is found in section 262 of the same chap-
ter, which provides : 'A failure to comply with the
provisions of sections 23 and 24 (sections 260 and 261)
of this act shall render each and every officer, agent and
stockholder of any such corporation, so failing therein,
jointly and severally personally liable on any and

all contracts of such company made within this state during the time that such corporation is so in default.' The fair implication is that, in the judgment of the legislature of Colorado, this penalty was ample to effect the object of the statute prescribing the terms upon which foreign corporations might do business in that state. It is not for the judiciary, at the instance or for the benefit of private parties, claiming under deeds executed by the person who had previously conveyed to the corporation, according to the forms prescribed for passing title to real estate, to inflict the additional and harsh penalty of forfeiting, for the benefit of such parties, the estate thus conveyed to the corporation and by it conveyed to others.   .   .   .

If the legislature had intended to declare that no title should pass under a conveyance to a foreign corporation purchasing real estate before it acquires the right to engage in business in the state, and that such a conveyance should be an absolute nullity as between the grantor and grantee, leaving the grantor to deal with the property as if he had never sold it, that intention would have been clearly manifested.   .   .   .

The views we have expressed are supported by several adjudications in this court in cases somewhat analogous to the present one, among which are those arising under sections 5136 and 5137 of the Revised Statutes of the United States. [U. S. Comp. St. 1901, pp. 3455–3460.] The first of those sections authorizes national banking associations to loan money on personal security. The other section provides: 'A national banking association may purchase, hold and convey real estate for the following purposes, and for no others: First, such as shall be necessary for its immediate accommodation in the transaction of its business. Second, such as shall be mortgaged to it in good faith by way of security for debts previously contracted. Third, such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings. Fourth, such as it shall purchase at sales under judgments, decrees or mortgages held by the association, or shall purchase to secure debts to it. But no such association shall hold the posses-

sion of any real estate under mortgage, or the title and possession of any real estate purchased to secure any debts due to it, for a longer period than five years.'

"In *National Bank v. Matthews*, 98 U. S. 621, 627 [25 L. Ed. 188], the question was directly presented whether a national bank was entitled to the benefit of a deed of trust upon real estate, which, with the note described in it, was taken—not as security for, or in satisfaction of, debts previously contracted in the course of its dealings, but—for a loan made by the bank at the time the deed of trust was assigned to it. The supreme court of Missouri held the deed of trust to be void in the hands of the bank, because its loan was made upon real-estate security in violation of the statute. But this court, after observing that the result insisted upon did not necessarily follow, said: 'The statute does not declare such a security void. It is silent upon the subject. If congress so meant, it would have been easy to say so ; and it is hardly to be believed that this would not have been done, instead of leaving the question to be settled by the uncertain result of litigation and judicial decision. Where usurious interest is contracted for, a forfeiture is prescribed and explicitly defined.' Again : 'Where a corporation is incompetent by its charter to take a title to real estate, a conveyance to it is not void, but only voidable, and the sovereign alone can object. It is valid until assailed in a direct proceeding, instituted for that purpose.'

"In *National Bank v. Whitney*, 103 U. S. 99, 103 [26 L. Ed. 443], which involved the validity of a mortgage to a national bank, to secure future advances made to the mortgagor, the right of the bank to enforce the mortgage was sustained upon the principles announced in *National Bank v. Matthews*. The court said : 'Whatever objection there may be to it as security for such advances from the prohibitory provisions of the statute, the objection can only be urged by the government.' To the same effect are *Swope v. Leffingwell*, 105 U. S. 3 [26 L. Ed. 939], and *Reynolds v. Crawfordsville Bank*, 112 U. S. 405, 412 [5 Sup. Ct. 213, 28 L. Ed. 733].

"In *Smith v. Shelley*, 12 Wall. 358, 361 [20 L. Ed.

430], which was an action of ejectment, the question was collaterally raised as to the validity of the title acquired by a banking institution, under a deed of the premises, in consideration of a certain sum paid by it to the grantor.   The bank was created by an act of the territorial legislature of Nebraska, with power 'to issue bills, deal in exchange, and to buy and possess property of every kind.'   But when that act passed, there was in force an act of congress, which provided that 'no act of the territorial legislature of any of the territories of the United States, incorporating any bank or any institution with banking powers or privileges, hereafter to be passed, shall have any force or effect whatever, until approved and confirmed by congress.'   The act of the territorial legislature incorporating the bank above referred to never was approved or confirmed by congress.   It was urged as an objection to the deed made to the bank—upon which deed one of the parties relied—that it was not a competent grantee to receive title.   This court said: 'It is not denied that the bank was duly organized in pursuance of the provisions of an act of the legislature of the territory of Nebraska; but it is said it had no right to transact business until the charter creating it was approved by congress.'   This is so, and it could not legally exercise its powers until this approval was obtained; but this defect in its constitution cannot be taken advantage of collaterally.   No proposition is more thoroughly settled than this, and it is unnecessary to refer to authorities to support it."

A leading case among those decided by the state courts is that of *Washburn Mill Company v. Bartlett,* supra.   In the opinion it was said:

"The cases which we have cited from the various classes demonstrate, perhaps, the lack of uniformity with more certainty than they point to the correct rule of construction.   Yet when studied, the cases are all found seeking one common object, the legislative purpose.   'The intent of the lawmaker is the law;' the embarrassment is in declaring that intent.   This intention may be declared in the act, or it may be in-

ferred from its provisions in connection with the sub-
ject-matter and circumstances.   *Howell v. Stewart*, 54
Mo. 400; *Machine Co. v. Caldwell*, 54 Ind. 279 [23
Am. Rep. 641].   In the statute under discussion
the legislature specified reasonable terms on which a
corporation could launch its business over the entire
state, unquestioned by private interests or sovereign
power.   Whatever may have been the primary pur-
pose of the legislature, it certainly was not to ex-
clude foreign corporations from the state.   Nor is it
reasonable to presume that it was the legislative in-
tent to declare all contracts made with foreign corpo-
rations without compliance with the statute absolutely
void.   It were a reflection upon legislative wisdom to
presume that consequences so unusually harsh and
oppressive were expected to flow from the use of
language so mild and uncertain.   Our statute is a
simple inhibition.   It declares no penalty.   It does
not declare the transaction of business unlawful or
contracts void.''

The second rule announced by the learned court of
appeals in the case of *Blodgett v. Lanyon Zinc Co.*,
supra, needs a slight modification to bring it into har-
mony with the views of this court.   That which is
within the reason of the law is a part of the law, and
the matter of penalty is only one consideration in de-
termining the scope of a legislative act.   Whenever
the law has made the doing of an act a crime this
court has held contracts made in contravention of it
to be illegal and unenforceable.   (*Pinney v. Bank*,
68 Kan. 223, 75 Pac. 119; *Yount v. Denning*, 52 id.
629, 35 Pac. 207; *Alexander v. O'Donnell*, 12 id. 608.)
But the imposition of a heavy penalty has been con-
strued to entail no such consequence.   In construing
a statute of this state relating to the filing of town-
site plats, this court said, in *Bemis v. Becker and
others*, 1 Kan. 226, 250:

''In other words, that contracts in contravention

of a statute are not to be held void, unless the court, from an examination of the statute, shall judge such to have been the intent of the legislature, though such intent will be presumed unless the contrary can be fairly inferred. We find, on examination of the statute in question in this case, that the manifest object of it was to protect the public and the unsuspecting purchaser against shams and devices of unscrupulous town projectors and proprietors and other persons, by the imposition of a penalty sufficient, in the judgment of the legislature, to secure conformity to its provisions.

"It is enacted, in the sixth section (Stat. 1855, ch. 156) that such map or plat, so acknowledged, certified, and deposited in the recorder's office, shall be a sufficient conveyance to vest the fee of such lands therein named as intended for public uses, as streets, parks, etc., in the county, for the use of the public; and to enforce such acknowledgment and deposit of the plat, the act provides a penalty or forfeiture of $300 for every lot sold previous to the deposit of such plat. Non-compliance with the requirements of the act is not made a misdemeanor punishable by a fine, nor is it indictable in the courts. But the penalty is, by the eighth section, to be recovered by action of debt for the use of the county.

"There is certainly no rule of ethics or principle of common law against the selling of lots in a town without depositing a map thereof in the recorder's office of the county; the offense, therefore, is precisely of the nature, form, proportions and extent which the legislature has declared.

"By that authority, and that alone, the act is made penal; and although the words of the fifth section are, that 'any person' who shall sell or offer for sale such lots shall forfeit $300, yet, as it can hardly be presumed that the legislature intended to impose the penalty upon any except those upon whom it imposes the duty of acknowledging and depositing the plat, we are inclined to the opinion that the words 'any person,' in the fifth section, are to be construed in connection with and limited by the provisions of the

first section which creates the duty.   The same power, then, which creates the offense; provides the penalty and designates the offenders.   The contrary interpretation, contended for by the defendants in error, would confound the innocent with the guilty, subjecting them alike to the penalties of the act, and make it, instead of a protection to the credulous and unsuspecting, a trap and a snare for the feet of the unwary.''

To say that the legislature intended the statute to render void contracts made without complying with it is to say that the legislature intended that if a foreign company should write life insurance in this state it might take the premiums, and then, upon the death of the persons assured, refuse to pay the policies ; and it is to say that a farmer of this state may purchase a machine or a herd of cattle from a non-resident corporation on credit, secure the price by a chattel mortgage, refuse to pay, and then defeat an action of replevin for the property.   Such an interpretation might attract the enthusiastic admiration of the highwayman, but it has nothing to commend itself to a court of justice.

At an early day this court said :

''A foreign insurance company doing business in this state, when sought to be made liable for its contracts made here, is estopped from saying that they are doing business contrary to law.''   (*Germania Ins. Co. v. Curran*, 8 Kan. 9, 16.)

And there can be no doubt that the estoppel bears equally upon both parties to the contract.   In commenting upon certain cases indicating a contrary view, Mr. Thompson says :

''Such decisions put the contracts under consideration, although perfectly innocent and meritorious in themselves, on the footing of contracts which are es-

sentially criminal, corrupt, or fraught with moral turpitude, or otherwise opposed to the public policy of the state.    In leveling such contracts to this ground. and in allowing their own citizens to repudiate them on such a plea, while keeping the consideration, the courts degrade the commercial morals of the people, encourage general dishonesty, expel capital from the state, and bring its judiciary into deserved disrepute." (6 Thomp. Corp. 6332.)

If it be said that the statute is weak unless the court can aid it by laying its hand upon contracts, the reply is obvious — that stringency is a question of policy with which this tribunal has no concern.    As Mr. Justice Brewer remarked in the *Prohibitory-amendment Cases*, 24 Kan. 700, 706 :

"Questions of policy are not questions for the courts.    They are wrought out and fought out in the legislature and before the people.    .   .   .    We make no laws.    .   .   .    We inaugurate no policy."

It is utterly illogical to compromise in a matter of interpretation, to palter with the status of such contracts and attempt to distinguish between those which are executed and those which are unexecuted, or to say they may be voidable if they are not void, or withhold remedies for a time.    Such contracts are valid or invalid, and if valid are not subject to cancelation, and are enforceable as other contracts are enforceable, except as the law has restricted the corporation in its right to maintain an action or recover a judgment.

Thus far the case has been considered as if the contracts assailed were made between a foreign corporation and a private individual.    That they were made with a state agency and that this action is brought by the state has become immaterial, if it ever did afford a basis for distinction.    The prohibition of the statute is against the doing of business in this state.    The

conditions are such that a corporation may at any time, upon its own volition, qualify itself to do business. When the American Book Company complied with the law and received permission to do business in the state such permission was subject to no restriction and the doing of business no longer remained improper, even though based upon a previous contract. The opinion of Judge Hammond upon this point in the case of *Cæsar v. Capell*, 83 Fed. (C. C.) 403, 424, is clear and convincing :

"Whatever invalidity and infirmity there was arose solely and entirely out of the fact that the legislature had prohibited the making of the contract, and out of the sentiment that that which the legislature chooses to prohibit is just as much unlawful as if, it were within itself vicious and immoral. Concede this ; yet, if we find that the prohibition itself is only provisional, and not absolute ; that the infirmity only arises under prescribed conditions, which may be removed, and that by the very terms of the act itself the conditions are such that they are within the control of the foreign corporation itself ; that it may, by doing or not doing a particular thing, create the conditions or remove them—it necessarily follows, it would seem, that the act of the party itself is all-sufficient to give that validity or invalidity to the contract which depends alone upon compliance or non-compliance with the conditions, according to its choice. Where the conduct is not within itself vicious and immoral, or condemned by a public policy existing entirely outside of any mere legislative expression of it, there would seem to be no very sound reason for holding to the sentimental idea that, once a contract is prohibited, it remains always prohibited, until the legislature may choose, by subsequent enactment, to remove the prohibition. The legislature might undoubtedly in the beginning have imposed such absolute prohibition, but it did not. It imposed only conditional prohibitions and those conditions were left within the control of the parties to the contract, or

one of them.   Therefore it seems to us to be correct
in principle to hold that subsequent compliance with
the conditions of the statute would remove any objec-
tion that might ever have been made to the making
of the contract, in such a case as that.   It is no ob-
jection to this reasoning to say that this is giving
retroactive effect to the act of compliance, because
there is no reason why it should not be retroactive ;
and, in the very nature of the subject-matter of the
legislation, such retroactive effect is possible, and will
be presumed, in favor of the paramount public policy
of freedom of contract, to have been within the con-
templation of the legislature, and within its grant of a
power to remove by compliance the obstructive con-
ditions.''

The same reasoning applies to the right to maintain
an action and recover a judgment in litigation begun
before annual statements are filed.   Whether or not
an injunction might be granted at the suit of the state
in aid of a judgment of ouster to prevent the perform-
ance of contracts made, or the maintenance of suits
begun, after such a judgment, is not now a question
calling for decision.

Besides all this, the state must fail in this action
upon another ground.   The business of the American
Book Company to be done in this state was that of
supplying the schools of the state with text-books, and
before any books could be sold the company was re-
quired to establish agencies throughout the state and
arrange with dealers for the purpose of carrying on
such business in a particular way.   The preliminary
negotiations with the state text-book commission,
whereby the book company became obligated to enter
upon, and conduct, the contemplated business, was
not the doing of business itself within the meaning of
the statute.   Viewed from the standpoint of the state,
the advertisement, the bid, the acceptance, the con-

tract and the bond amounted to nothing more than the employment of an agent who should, within thirty days after the governor's proclamation, take charge of, and conduct, the school-text-book business of the state.   If it be an essential feature of the business of a corporation to promote contracts, as a broker may do, then the making of contracts by such company may constitute the doing of business, but no such question is presented here.   The case is identical in principle with that of *Hogan v. City of St. Louis*, 176 Mo. 149, 75 Pac. 604, decided by the supreme court of Missouri in June, 1903.   The syllabus reads:

"Our statutes do not mean that a foreign corporation must establish a public office within this state, where books are kept and processes may be served, and must have a license from the secretary of state to do business within this state, before it can enter into a contract to do business within the state; and a city which enters into a contract with such foreign corporation for the lighting of its streets cannot be enjoined from carrying out such contract on the ground that it is illegal."

In the opinion it was said:

"Now, when our statutes say that a foreign corporation shall not 'transact business' here until it establishes a public office in this state where books are kept and process may be served and until it pays its *quasi*-incorporation tax and takes out its license, do they mean that the corporation must do all those acts before it can lawfully enter into a contract to do any business here?   Does our law mean that when advertisements inviting bids on public or private works in this state are read by foreign corporations they are to understand that they have not the right to bid and have their bids accepted unless they shall have already complied with the terms of our statute to enable them to transact business here?   No, that is not the meaning of our statutes.   No such policy of exclusion

has ever been shown in any of our legislative acts; foreign corporations have always been invited and encouraged to come. The obtaining of a desirable contract is sometimes an inducement for a foreign corporation to come into the state; it is not bound to establish itself here before it can obtain such a contract.

"Entering into a contract like the one in question undoubtedly is 'transacting business,' within the unlimited meaning of the term, but that is not the sense in which the term is used in the statute just quoted. As there used it means carrying on the work for which the corporation was organized, and in its application to the facts of this case it means performing the work called for by the contract."

Although the writer fully concurs in the foregoing statement of the law, he is constrained to say that in his opinion a more fundamental reason exists for upholding the judgment of the district court. The Bush law has no application to the facts of this controversy. In order better to discharge the exalted duty enjoined upon it by section 2 of article 6 of the constitution, the legislature undertook to secure uniformity of textbooks in the common schools. In doing so it exercised a sovereign power. The matter of procuring a corporation to supply needed books is purely a state affair; no private right attaches to it. Nor is the act one of ordinary trade or commerce, in which the state may divest itself of the attributes of sovereignty and conduct itself as an individual may do. The most distinctively sovereign prerogatives of the legislature, under the constitution, are enlisted and concerned. Unable to attend to certain details of the work proposed, a special agent was created, and clothed with such authority as seemed necessary to accomplish the legislative design. The state text-book commission is a public agency created to aid in the assertion of a public right and the execution of a public power in

the interest of the public welfare.  Corporate power is withheld from it; it possesses no prerogatives personal to itself or its members, and the state alone can enforce the contracts it may negotiate.  It is merely the arm of the legislature, and the character of the acts done by it cannot be distinguished from the character of governmental acts performed by the legislature itself.

Under the text-book law bids are protected by unconditional certified checks, forfeitable upon failure to contract, and contracts are protected by bonds, forfeitable upon failure to perform.  These measures afford ample security to the state in the business it undertakes to do.  One of the paramount purposes of the text-book law is to engender the widest possible competition, in order to secure to the children of the state the highest quality of text-books at the lowest possible price.  Publishing houses everywhere are invited and expected to place their resources at the command of the state for the good of the common schools.  Any limitation or burden other than those the text-book law itself contains would tend to thwart this purpose.  In the field selected by the legislature for this exhibition of its power it is supreme.  It may adopt its own method of obtaining bids, and may contract with any one it will, whenever it pleases to do so, through whatever medium it chooses to employ.  The transaction is its own and is subject to no limitation that is not self-imposed.

The statute does not in express language refer to the state.  Only general terms are used.  It is a rule of interpretation that "the general language of statutes will be limited to such persons and subjects as it is reasonable to presume the legislature intended it should apply." (*The State v. Smiley*, 65 Kan. 240, 69 Pac. 199.)  It is not reasonable to presume that the

legislature intended the general language of the Bush law to be binding upon itself in respect to contracts of the character in question. To do so would be to presume that the legislature undertook to cripple and curtail its own power to discharge governmental functions, and undertook to diminish the fund of its own resources for that purpose, and would put the legislature in the attitude of deliberately compassing the defeat of its own designs.

"The king is not bound by any act of parliament, unless he be named therein by special and particular words. The most general words that can be devised ('any person or persons, bodies politic or corporate, etc.') affect not him in the least if they may tend to restrain or diminish any of his rights or interests. For it would be of most mischievous consequence to the public if the strength of the executive power were liable to be curtailed without its own express consent, by constructions and implications of the subject." (1 Black. 261.)

This rule has been adapted to the requirements of the political system prevailing in this country, and is now universally recognized. Chancellor Kent states it as follows:

"It is likewise a general rule, in the interpretation of statutes limiting rights and interests, not to construe them to embrace the sovereign power or government, unless the same be expressly named therein, or intended by necessary implication." (1 Kent, 460.)

Many pertinent authorities illustrating applications of this principle are collated in volume 26 of the second edition of the American and English Encyclopædia of Law, at page 644, and in cross-references there indicated.

However, for the reasons first given, the judgment of the district court is affirmed.

All the Justices concurring.