BOATMEN'S BANK OF ST. LOUIS, MO., v. FRITZLEN.†

FRITZLEN v. BOATMEN'S BANK OF ST. LOUIS, MO.

(Circuit Court of Appeals, Eighth Circuit. March 1, 1915.)

Nos. 3548, 3549.

1. LIMITATION OF ACTIONS ⊕⇒24—LIMITATION APPLICABLE—WRITTEN OR UNWRITTEN CONTRACT—"SHALL PAY."
Under a mortgage on cattle providing that the mortgagor should pay to the mortgagee the indebtedness therein described, and all sums loaned, advanced, or expended by the mortgagee for the maintenance or transportation of the mortgaged property, or for any purpose connected therewith, there was a specific obligation on the part of the mortgagor to repay money advanced for feed and other expenses connected with the cattle, and an action to enforce such obligation was one on a written contract within a statute providing a five-year limitation for written contracts and a three-year limitation for contracts not in writing, as the words "shall pay" were to all intents and purposes the same as "agree to pay."

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 112–117; Dec. Dig. ⊕⇒24.]

2. LIMITATION OF ACTIONS ⊕⇒130—COMPUTATION OF PERIOD OF LIMITATION—PENDENCY OF LEGAL PROCEEDINGS.
Under a Kansas statute providing that if an action be commenced within due time, and plaintiff fail otherwise than upon the merits, or if a judgment for plaintiff be reversed, and the time limited therefor shall have expired, plaintiff may commence an action within one year after the reversal or failure, where in an action brought within the period of limitation a judgment for plaintiff was reversed within one year before the bringing of a new action involving the same matter, the new action was not barred by limitations.

[Ed. Note.—For other cases, see Limitations of Actions, Cent. Dig. §§ 539, 545, 553–566; Dec. Dig. ⊕⇒130.]

3. APPEAL AND ERROR ⊕⇒882—REVIEW—ESTOPPEL.
Where the exclusion of the record of a prior action, the pendency of which was relied upon as suspending the running of limitations, was due to defendant's improper objection to its admissibility, he was estopped to deny that the record was as tendered, and it would be assumed that the record sustained the allegations of the reply showing the suspension of limitations.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3591–3610; Dec. Dig. ⊕⇒882.]

4. LIMITATION OF ACTIONS ⊕⇒185—PLEADING IN AVOIDANCE OF STATUTE—REPLY.
Under the practice in Kansas, a prior action suspending the running of limitations may be pleaded by way of reply, and need not be pleaded in the complaint.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 694; Dec. Dig. ⊕⇒185.]

5. COURTS ⊕⇒347—UNITED STATES COURTS—STATE LAWS AS RULES OF DECISION—RULES OF PRACTICE.
The state law, permitting a prior action suspending the running of limitations to be pleaded by way of reply, is binding on the United States District Court.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 921; Dec. Dig. ⊕⇒347.

State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

221 F.—10        † Rehearing denied May 27, 1915.

**6. CHATTEL MORTGAGES ☞164—RIGHTS OF PARTIES—MAINTENANCE OF PROP-ERTY.**

A chattel mortgage on cattle, whereby the mortgagor agreed to repay all sums loaned, advanced, or expended by the mortgagee for the maintenance of the property, imposed no obligation on the mortgagee to make advances for feed for the cattle, though it was given a right to make such advances and to have a lien therefor.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 294–296; Dec. Dig. ☞164.]

**7. CHATTEL MORTGAGES ☞164—RIGHTS OF PARTIES—MAINTENANCE OF PROP-ERTY.**

That a chattel mortgagee of cattle had a mortgage on all the mortgagor's real and personal property imposed no implied obligation on it to furnish the necessary feed for the cattle on the theory that the mortgagor had no ability to furnish the feed, as he still had an equity in the property which might furnish a basis for purchases by him, he still had his personal credit resulting from his presumably good character, he was in possession of the real estate, with all the facilities for raising feed thereon, there had in previous years been no occasion to buy feed, and as a part of the giving of the mortgages some cash was paid to the mortgagor.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 294–296; Dec. Dig. ☞164.]

**8. CHATTEL MORTGAGES ☞164—RIGHTS OF PARTIES—MAINTENANCE OF PROP-ERTY.**

A mortgagor, under a mortgage on cattle which authorized the mortgagee to make advances for the maintenance of the property and to have a lien therefor, told the mortgagee's agent he would need feed, to which the agent responded, "All right." About January 6th, the mortgagor saw the agent with respect to furnishing feed, and saw a dealer regarding the purchase of such feed. The agent promised to see the dealer regarding the matter the next day, and within a few days did place with the dealer a rush order for the feed, and several times later asked the dealer to hurry the order along. The company from whom the dealer ordered the feed having failed to fill the order, he on January 21st placed another with a different firm for immediate shipment, and not later than February 3d the shipment was delivered to a carrier, properly consigned to the mortgagor. The bill of lading was forwarded to the mortgagor, and received not later than February 8th. There was a delay in transporting the feed, but the mortgagee did not learn thereof until February 22d, when a tracer was instituted. The shipment reached the mortgagor on March 4th, but in the meantime an unusual storm had prevented the cattle from reaching the grass through the frozen snow, as a result of which many of them died. In the conversation between the mortgagor and mortgagee's agent, nothing was said about how the feed was to be delivered or consigned, or where the mortgagee was to buy the feed. *Held*, that the agreement of the mortgagee was simply to buy and send, and not to deliver, the feed, and such agreement was satisfied by placing the order and delivering it to a common carrier for shipment within a reasonable time and with reasonable promptness in view of the surrounding circumstances.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 294–296; Dec. Dig. ☞164.]

In Error to the Circuit Court of the United States for the District of Kansas; John C. Pollock, Judge.

Action by the Boatmen's Bank of St. Louis, Mo., against D. G. Fritzlen. There was a decree for plaintiff on one cause of action, and

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in favor of defendant on his counterclaim, and each party brings error. Reversed, with instructions.

See, also, 221 Fed. 154, —— C. C. A. ——.

James S. Botsford, of Kansas City, Mo. (Buckner F. Deatherage and Goodwin Creason, both of Kansas City, Mo., on the brief), for plaintiff.

H. J. Bone, of Topeka, Kan. (D. R. Hite, of Topeka, Kan., on the brief), for defendant.

Before HOOK and SMITH, Circuit Judges, and POPE, District Judge.

POPE, District Judge. The plaintiff in error brought suit against Fritzlen to recover a money judgment. The case proceeded on two causes of action. The first was upon a note for $32,920.15, made on the 30th of November, 1901, upon which a balance of $26,234.58 was claimed. The second cause was for money advanced for the keep and other expenses connected with a large number of cattle upon which Fritzlen had given a chattel mortgage, covering not only the indebtedness secured by the first count of complaint, but also the advances covered by the second count. The defendant answered, setting up a large number of defenses, and also setting up by way of counterclaim an action for damages arising out of the alleged failure of the plaintiff bank, upon a contract alleged to have been made by it, to furnish feed, by reason of which failure a large number of cattle of Fritzlen died during and following a severe storm in February, 1903.

Upon trial of the cause to a jury there was a verdict for the plaintiff upon both causes of action, and in favor of the defendant Fritzlen upon his counterclaim. Upon motion for new trial, the court allowed the verdict upon the second count of the complaint and upon the counterclaim each to stand, but granted a new trial as to the verdict upon the first count of the complaint. The plaintiff bank thereupon dismissed this cause of action without prejudice, the judgment was entered upon the rest of the case. This course of the matter relieves us from any consideration upon this writ of error of anything connected with the suit upon the note, and leaves simply for consideration, first, whether the record, so far as it relates to the bank's second cause of action, is free from error, and, second, whether the proceedings by which Fritzlen was awarded damages upon his counterclaim are sustainable. This involves a consideration of the several defenses mutually made against these claims.

[1] Dealing first with the bank's second cause of action: This was for the sum of $4,600.75 and interest, and the verdict of the jury was for $4,712. No point is made upon the amount of this, but defendant contended in the court below, and here contends, first, that the bank could not sustain this cause of action, for the reason that it had not complied with the laws of the state of Kansas permitting foreign corporations to hold securities or sue in their jurisdiction, and, second, the cause of action was barred by the Kansas statute of limitations. The availability of this first defense is considered and decided adversely to Fritzlen in the opinion of this court this day handed down in the equity

case between the same parties, being Nos. 3550 and 3588 on the docket of this court, 221 Fed. 154, —— C. C. A. ——. That matter will not, therefore, be further considered here. The case upon this, therefore, reverts solely to the question whether the Kansas statute of limitations barred the action. This statute in brief provides a five-year limitation for written contracts and a three-year limitation for contracts not in writing. The last item of the count upon which the second cause of action proceeded was October, 1903. This suit was not filed until 1907, so that more than three years intervened. If the matter is governed by the three-year limitation, the defense is well taken. We are of opinion, however, that the case was upon a contract in writing. The action by plaintiff resulted from the following terms of the chattel mortgage securing the indebtedness involved in the first count above mentioned:

"This sale is a mortgage upon the following conditions: The first party shall pay to the second party, first, the indebtedness above described when the same becomes due, either as above set forth or according to the terms of any extension or renewal note or obligation; second, all sums loaned, advanced, or expended by the second party for the maintenance or transportation of said property, or for any purpose connected therewith; third, all indebtedness of any character created or maturing while any indebtedness of the character mentioned in the two foregoing paragraphs remains unpaid."

It will be noted that this is not a mere recital of an indebtedness constituting a consideration for a mortgage, but is a specific obligation to pay these expenses incurred in the transportation and upkeep of the cattle. If it were the former, doubtless the general rule indicated in the authorities cited for Fritzlen would prevail that no cause of action in personam arose upon the instrument, but that the one remedy would be against the property. But here the parties specifically agreed that the mortgagor, Fritzlen, shall be responsible for these amounts. We deem it immaterial that the words are that the first party "shall pay." This to all intents and purposes is the same as "agree to pay," and if the latter words were used it could hardly be claimed there was no agreement. We think, therefore, that the effect of the transaction was not only a mortgaging of the property and a recognition of this expense as an element protected by the mortgage, but that the wording of the mortgage is a specific obligation in writing to pay these sums. Being thus in writing, the Kansas statute gives five years to bring the action. There was thus no bar of the statute against it.

[2] There is another aspect in which the defense of the statute of limitations cannot be sustained. The plaintiff in its reply to the defense of the statute of limitations alleges as follows:

"The plaintiff says that all of the items set forth in the second cause of action were the subject of litigation between plaintiff and defendant in said case of Welden against the defendant and plaintiff respecting said items and accounting, and said cause was pending in said district court of Clark county, Kan., in said case against Welden and this defendant and this plaintiff, from April, 1904, to April, 1907."

There is a provision of the Kansas law upon this matter of limitations as follows:

"If an action be commenced within due time and a judgment thereon for the plaintiff be reversed; or if the plaintiff fail in such action otherwise than

upon the merits, and the time limited for the same shall have expired, the plaintiff, or if he die and a cause of action survive, his representative may commence an action within one year after the reversal or failure."

The present suit was brought within one year after the Welden Case had been reversed by the Supreme Court of Kansas. The result of this last is to remove the claim from the running of the statute while pending in the state court of Kansas, so that with this period deducted there would, independent of the other question, not have been any bar resulting from the three-year limitation.

[3] It is said, however, that this court cannot consider the Kansas statute, nor the proceedings in the Welden Case, which show the pendency of this claim before the state court in this case, for the reason that the court below, upon objection by Fritzlen, refused to receive the Welden transcript showing the facts as pleaded. But the defendant, having made the record in this respect, must be held to it, and since he contended below that these proceedings were immaterial, he may not debar his adversary from the benefit of these proceedings upon the argument here that they are not before the court, when that contention is due to his improper objection below to their admissibility. Under such circumstances, as we have held in Union Pacific Ry. Co. v. Harris, 63 Fed. 800, 12 C. C. A. 598, he is estopped to deny that the record is as tendered. We assume, therefore, that the record sustains this allegation of reply, and this latter, when compared with the Kansas statute, demonstrates that the three-year statute, allowing for the proper deduction from that period, had not run when this suit was brought upon the second cause of action.

[4, 5] There is also some point made that the exception embodied in the Kansas statute should have been pleaded in the complaint and cannot properly be introduced into the case by way of reply. The practice, however, in Kansas, is otherwise. Kirk v. Andrew, 78 Kan. 612, 97 Pac. 797. And, this being the law of Kansas, the United States District Court therein is bound by it. R. S. § 914 (Comp. St. 1913, § 1537); Chemung Canal Bank v. Lowery, 93 U. S. 72, 76, 23 L. Ed. 806.

This disposes of all that is said against the judgment awarded to plaintiff upon the second cause of action.

We come, now, to the questions arising upon the award of $13,160 against plaintiff upon defendant's counterclaim. The plaintiff, by repeated motions and objections, presented to the court below, raised the question of whether the facts proved afforded ground for recovery. There were also a number of questions raised upon the admissibility of evidence on the trial of this counterclaim, and a question is also made in the case against the court's allowing the verdict on the counterclaim to be set off against that secured by plaintiff upon this second cause of action just dealt with. The defendant's allegations upon his counterclaim are briefly outlined as follows: The bank, in taking the promissory note of November 30, 1901, had a mortgage upon all of defendant's live stock, and also upon all of defendant's real estate, leaving him, as the bank well knew, without resources to purchase feed for such stock. The mortgage, as we have above seen, gave the bank a lien upon the stock for "all sums * * * advanced

or expended by the second party 'for the maintenance of said property." In November, 1912, Fritzlen in conversation with Smith, an agent of the bank, stated to such agent that help would be necessary from the bank to carry the stock through the winter, and that such feed would be needed by February 1, 1903. In the early part of January, 1903, the exact date being variously stated from January 6th to January 8th, Fritzlen was again in Kansas City, and at that time told Smith, the agent of the bank, that this feed would be needed, and asked that it be arranged for at once. The plaintiff's case is to the effect that Smith promised then and there to secure and send certain oil cake to be used as such feed for the stock. The feed did not finally arrive until about March 4th. During the last days of February, a very heavy snowstorm came up in that section of Kansas. The character of this was such that the grass upon which cattle ordinarily grazed, even in winter, was covered and frozen over, so as not to be accessible for grazing, with the result that a large number of animals belonging to Fritzlen died. The claim on behalf of Fritzlen is that, had this oil cake been seasonably shipped pursuant to what he alleges to have been his understanding with Smith, it would have reached him in time to have been fed to the cattle, and the loss thus prevented.

[6] The controlling question, of course, is whether, in view of what passed between Fritzlen and Smith, and in view of what Smith did thereafter, there was, first, a binding obligation upon the bank to furnish this feed; and, second, assuming such obligation to have existed, was it fulfilled by the bank? Any obligation to furnish food did not arise from the terms of the chattel mortgage. An examination of this shows no agreement by the bank to provide feed for the stock. True, it gives the bank the right to advance money for transportation of the cattle, and for its maintenance, and allows the bank a lien upon the cattle for any sum so advanced. But this was an agreement purely in the interest of the bank, and in order that it might have the privilege of protecting its security by advances for feed when in its judgment desirable. This, however, did not bind the bank to furnish such feed, and the fact that there was no such obligation resting upon the bank as a result of the written instrument executed is frankly conceded by counsel in the briefs at bar.

[7, 8] It is said, however, that the situation surrounding the parties created an obligation upon the bank to furnish. The situation was, it is claimed, that Fritzlen was mortgaging all his property, both real and personal, to the bank, and that, as his assets were all thus being tied up, there arose the implied obligation that the bank would furnish him the necessary feed for the cattle, since his ability to buy it was at least detracted from by his giving a lien upon all his property. We do not see, however, that this follows. To begin with, the giving of the lien did not destroy all his credit. He still had an equity in the various properties which might furnish a basis for purchase by him, and there still remained his personal credit, resulting from his presumably good character, which we must assume still left him in a position to borrow. But, aside from this, he was left in possession of the ranch, and with all the facilities for raising feed thereon. It is shown by the evidence that in previous winters, with possibly one exception,

there had been no occasion to buy feed, so that it could not have been in contemplation of the parties that the purchase of feed would be inevitable; also it may have been, and doubtless was, assumed in the making of the note and giving of the mortgages that in the future as in the past, the results from the ranch would be sufficient to support the cattle. In addition, the loan of over $32,000 as made included a balance of cash to credit of Fritzlen for such use as he might desire to make—among others, the protection of the stock. It might have been assumed by the parties, therefore, in the loan, that this amount would suffice to meet any exigencies confronting Fritzlen in connection with the cattle. At any rate, these various facts show there was not such a situation as necessarily raised the implication of an obligation to furnish money by the bank to feed these cattle. If there were this possibility ahead of Fritzlen, and it was so recognized by him and by the bank at the time, he might have exacted an obligation from the bank to provide feed. But, as we have seen, this was not done. Since, therefore, there was no express obligation, and since the situation did not necessarily, or even presumably, raise an implied obligation, it follows that we must look elsewhere to find, if at all, the obligation upon which this counterclaim rests for its maintenance. This latter, it is urged by the defendant, is found in part in what passed between Fritzlen and Smith, the bank's agent, in November, 1902, when Fritzlen told Smith that he would need feed by February 1st, and Smith said, "All right." The particular conversation, however, which is alleged to have created the obligation sued on, is that which occurred in January, 1903. It is claimed that Smith at that time in terms agreed to furnish this oil cake. The following is the testimony of Fritzlen upon this point:

"Q. Mr. Fritzlen, in that conversation with Smith, was anything said about where he was to buy the feed? A. No, sir. Q. Was anything said about how it was to be delivered to you? A. No, sir. Q. Was anything said to the effect that it was to be delivered to you on the cars any place? A. No, sir. Q. What, if anything, was said between you and Mr. Smith with reference to where the feed was to be sent? A. He was to buy the feed and send it to Kingsdown, Kan. Q. Did you know how he was going to consign it? A. No, sir. Q. Did you give any directions where he was to buy it? A. No, sir."

The ultimate contention, therefore, of defendant, is that Smith agreed on or about January 6, 1903, on behalf of the bank to buy the feed and send it to him at his ranch.

The foregoing is all that occurred between the parties tending to show a contract as to feed. What was done in its fulfillment by the bank? On the day of the January conversation between Fritzlen and Smith, variously stated as from January 6th to January 8th, Fritzlen saw a dealer in oil cake, to wit, one Cherry, at Kansas City, with regard to the purchase of this food for the cattle. Having talked with him, he returned to Smith's office, where he reported to Smith what he had found out as to prices from Cherry. Smith and Fritzlen thereupon went around to Cherry's office with a view of then and there providing for the feed, but found the office closed for the day. It being necessary that Fritzlen should return to his home in Kansas that night, Smith promised Fritzlen that he would go around and see

Cherry the next day in regard to the matter. Smith did, as promised, see Cherry, if not the next day, at least within a day or two. The testimony shows that he saw him perhaps as early as January 9th, and certainly not later than January 12th. Upon this visit, made pursuant to his agreement with Fritzlen, and to a responsible dealer suggested by Fritzlen, Smith placed a rush order for the cake. Cherry immediately in turn ordered it from Pettit & Co. of Memphis, his correspondents at that point. Smith, during the interval, did not overlook the matter, but, according to the uncontradicted testimony, several times called the matter to Cherry's attention, and asked him to hurry it along. Pettit & Co., for some reason, however, had failed to fill the order, and Cherry, without notifying Smith of this fact, but in response to Smith's repeated reminders that the order be filled, placed it again on January 21st, this time with the firm of Bunch & Co. of Little Rock. His order with Bunch & Co. was closed on January 21st, for immediate shipment. These latter secured the cake, and upon a day not entirely clear from the record, but in any event, not later than February 3d, delivered it to the Missouri Pacific Railroad, consigning to Fritzlen at his proper railroad station in Kansas. At Harrington, Kan., where the shipment was transferred to the Rock Island Railroad, it was for some undisclosed reason delayed by the latter company. The bill of lading was sent by Cherry to Smith, who in turn forwarded it to Fritzlen, by whom it was received not later than February 8th. Fritzlen made no complaint to the bank of the nonreceipt of the feed. It was not until on or about February 22d, when one Lukens, an agent of the bank, visited defendant's ranch, that it was discovered that the shipment had not yet arrived. Lukens, upon ascertaining this, immediately wired Smith of the fact. A tracer was instituted, the shipment was located, and it finally reached Fritzlen's railroad station not later than March 4th. Meanwhile, during the last days of February, a most unusual storm had visited that section, and many of Fritzlen's cattle died because of inability to reach the grass through the frozen snow. The fatal lack of food thus resulted, not from the ordinary severity of the winter, but from the peculiar conditions incident to the storm mentioned. Likewise, notwithstanding the delays in securing the cake, it would still have arrived before the storm, but for the delay in transit, which Fritzlen, although having the bill of lading, failed to report to the bank.

Upon this state of the record a number of points are raised against this judgment upon the counterclaim. Among these are the contentions that the bank, if under obligations at all, was under obligations simply to have this feed placed on board cars and shipped to Fritzlen, and that it seasonably complied with this duty in shipment from Little Rock on February 6, 1903. There is a further defense urged that the loss of the cattle was due to an unprecedented storm, and thus to the act of God. It is also said that there was a fatal failure of proof, in that it was not shown that any of the cattle lost belonged to the bank's mortgage; there having been on the range, not only the cattle mortgaged to plaintiff, but other cattle covered by mortgages to others. It is further said that the loss was due to Fritzlen's negligence, in that although failing to receive the feed for some weeks after February 8,

1903, the date upon which he received the bill of lading from Smith, he failed to notify the bank of the nonarrival of the feed, and thus debarred it from the opportunity to follow it up and thus get it there before the storm. It is also suggested that, even if the bank was negligent in placing this order, such was not the proximate cause of the death of the cattle, but that this latter was due to the negligence of the railroad company in failing to forward this feed promptly after the shipment, and that the death of the cattle was thus due to the railroad's negligence cumulative to and following upon plaintiff's negligence, and that the fault of the railroad company, rather than the plaintiff, is to be deemed the proximate cause in the matter.

We find it, however, sufficient, without disposing of these several contentions seriatim, to hold, as we do, that, even assuming that there was a sufficient consideration to constitute what passed between Fritzlen and Smith a binding contract upon the bank, the agreement there made was one simply "to buy and send" the cake needed. This Smith, on behalf of the bank, did within a reasonable time, indeed immediately, by placing the order with a reputable broker, by shipment upon a date which, but for unforeseen intervening causes, would have insured the arrival of the cake by the time it was needed, by sending Fritzlen the bill of lading weeks before the storm, by locating the missing shipment and starting it forward, when it was finally learned that the shipment had not been received. We are of opinion that any contract to buy and send was complied with by what the bank did. Such an agreement was not one to see that delivery was made. It was not an agreement to buy, send, and deliver, but to buy and send. It was satisfied by placing the order and delivering for shipment to a common carrier, each within a reasonable time, and with reasonable promptness in view of the surrounding circumstances. It follows, therefore, that the counterclaim was without evidence to sustain it, and the judgment awarding damages thereunder must be set aside.

In this view of the matter there is no occasion for us to consider the questions raised upon the record as to the admissibility of evidence, or the question raised by the record as to whether there should have been an offset between the amount recovered by the bank upon its second cause of action, and the amount recovered by Fritzlen upon his counterclaim. Since there was no right of recovery upon this latter, the details of the legal proceeding by which the amount was ascertained become immaterial, and we will not incumber the opinion with any discussion of this.

It results from the foregoing that the judgment of the court below will as to plaintiff's second cause of action be affirmed, and as to defendant's counterclaim reversed, with instructions to the court below to set aside the verdict and to reinstate the cause for further proceedings in conformity with the law.