BOATMEN'S BANK OF ST. LOUIS, MO., v. FRITZLEN et al. †

FRITZLEN et al. v. BOATMEN'S BANK OF ST. LOUIS, MO.

(Circuit Court of Appeals, Eighth Circuit. March 1, 1915.)

Nos. 3550, 3588.

1. MORTGAGES �köm125—FORECLOSURE—ATTORNEY'S FEES.

A mortgage providing that it was to protect, not only the indebtedness secured thereby, but all costs and expenses of enforcing it as provided by law, when construed in the light of a state statute, declaring invalid any provision in a mortgage designed to secure the payment of attorney's fees, did not authorize an allowance of the mortgagee's attorney's fees in a suit in equity to foreclose the mortgage, since equity is ancillary and not antagonistic to the law, and where a statute precludes such an allowance equity cannot aid in its circumvention.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 211½, 244, 245; Dec. Dig. ⊛125.]

2. MORTGAGES ⊛308—FORECLOSURE—MARSHALING ASSETS.

Where a real estate mortgage and a mortgage on cattle were given to secure a note, the chattel mortgage also providing that the mortgagee should have a lien for any advances made for the maintenance of the cattle, and the cattle were subsequently sold and the proceeds applied on the note, in a suit to foreclose the real estate mortgage, such proceeds would be applied, so far as necessary, on the claim for advances for the maintenance of the cattle, leaving the real estate liable for the amount of the note, notwithstanding a provision in the chattel mortgage that the proceeds of the cattle were to be used, first, in payment of the note, and, second, in payment of the advances, as this provision was intended to state the order of payments in dealing with the chattel mortgage, when viewed and enforced separately.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. § 874; Dec. Dig. ⊛308.]

3. CORPORATIONS ⊛657—FOREIGN CORPORATIONS—VALIDITY OF MORTGAGE.

Laws Kan. 1901, c. 127, § 2, providing, relative to the taking of mortgages, securities, and liens by foreign corporations, that every such corporation, before being entitled to take such lien and enforce it or any lien then held, should pay a specified fee and file a consent to be sued and for the service of process in a specified manner, did not render a mortgage to a foreign corporation, which had not complied therewith, void, as the act did not declare such a mortgage void, and the courts could not affix a penalty which the Legislature had not seen fit to provide.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2536–2541, 2550, 2552–2554; Dec. Dig. ⊛657.]

4. COURTS ⊛363—EFFECT OF STATE LAWS—FOREIGN CORPORATIONS—RIGHT TO SUE IN FEDERAL COURTS.

Laws Kan. 1901, c. 127, § 2, did not prevent a foreign corporation which had not complied with its requirements from suing in a federal court to foreclose a mortgage, as, whatever its efficacy as against actions in the state courts, it was not within the power of the state to limit the jurisdiction of the federal courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 939–949; Dec. Dig. ⊛363.]

5. CORPORATIONS ⊛641—FOREIGN CORPORATIONS—RIGHT TO SUE.

Laws Kan. 1901, c. 127, § 2, did not prevent a foreign corporation, which had not complied with its requirements, from suing to foreclose a mortgage given in 1901, since, if it barred such remedy, the barrier was removed by

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

† Rehearing denied May 27, 1915.

Laws 1903, c. 153, § 1, providing that foreign corporations may receive, take, purchase, and hold by mortgage or otherwise any securities or liens securing loans upon land, and sue upon, foreclose, or otherwise enforce them, and section 2, repealing Laws 1901, c. 127.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2519, 2604, 2607; Dec. Dig. &#x229E;611.]

6. MONOPOLIES &#x229E;23—ENFORCEABILITY OF CONTRACTS.

Plaintiff gave notes to a commission company for an amount which included commissions on sales of cattle at rates fixed by a live stock exchange, claimed to constitute an unlawful combination under the Kansas Anti-Trust Act (Laws 1897, c. 265). The commission company pledged the notes to a bank as collateral security for an indebtedness less than the amount of the notes; the bank having no knowledge of the alleged illegality. The bank took from plaintiff a renewal note for the amount of the notes so held, and the amount of an advance by it to him of $10,000, secured by a mortgage. *Held*, that as the bank was not the violator of the law, and was not even suing as the indorsee of the original notes, its note and mortgage were enforceable, especially as it did not appear that the rate fixed by the exchange was arbitrary or excessive, and the fact that a part of the amount recovered would be applied on the commission company's indebtedness, and any surplus paid to the commission company, did not affect the enforceability of such note and mortgage, as the bank's agreement with plaintiff was not in the interest of the commission company, and any benefit to the commission company was wholly incidental.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 16; Dec. Dig. &#x229E;23.]

Appeals from the Circuit Court of the United States for the District of Kansas; John C. Pollock, Judge.

Suit by the Boatmen's Bank of St. Louis, Mo., against D. G. Fritzlen and others. From the judgment, all parties appeal. Reversed and remanded, with instructions.

James S. Botsford, of Kansas City, Mo. (Buckner F. Deatherage and Goodwin Creason, both of Kansas City, Mo., on the brief), for plaintiff.

H. J. Bone, of Topeka, Kan. (D. R. Hite, of Topeka, Kan., on the brief), for defendants.

Before HOOK and SMITH, Circuit Judges, and POPE, District Judge.

POPE, District Judge. These cases constitute a companion appeal to those submitted in cases Nos. 3548 and 3549 between the same parties this day decided upon a writ of error from a judgment in the action at law between the Boatmen's Bank and Fritzlen. 221 Fed. 145, —— C. C. A. ——.

The present cause is upon a note given by Fritzlen to the plaintiff bank on November 30, 1901, for the sum of $32,920.15, and for the foreclosure of a mortgage on defendant's real estate given to secure this note. The court by its decree found that the original indebtedness upon this note was $31,923.09, and upon this basis proceeded to adjust the accounts between the parties, resulting in a decree for the bank of $13,095.71, and a foreclosure upon the real estate to satisfy this amount. By supplemental pleadings, and upon stipulation of the parties that there should in the present cause be an accounting between

the parties upon all branches of their transactions, there was introduced into the present case the testimony and the result reached in the case at law above referred to, to wit, the findings of the jury in favor of the bank for $4,712 on the bank's second cause of action in the suit at law, and the findings of the jury in favor of Fritzlen in the sum of $13,160 upon Fritzlen's counterclaim. The trial judge, acting upon his independent consideration of the facts, and without reference to the verdict of the jury, but upon the same evidence, found that the amounts awarded respectively to the plaintiff and defendant in the action at law were correct, and that these should be considered as items in favor of the respective parties in dealing with the present foreclosure suit. It was shown upon the trial that upon the original note of $32,920.15, made November 30, 1901, there had been a number of payments resulting from the sale of cattle covered by the mortgage given by Fritzlen to secure this indebtedness; that chattel mortgage having been made contemporaneously with a mortgage securing the same indebtedness placed upon certain real estate. These credits were as follows: Credits given on November 18, 1902, for the sum of $5,281.50, being proceeds of cattle sold by Fritzlen himself. The remaining four items of credit were as follows: November 17, 1903, $6,372.02; November 21, 1903, $7,813.85; November 23, 1903, $1,821; November 30, 1903, $2,985. These last four items were derived from the sale by the bank of the mortgaged cattle and of personal property covered by the chattel mortgage above referred to. This personalty had come into possession of the bank from the United States marshal, by whom it had been seized upon a replevin action brought by the bank in October, 1903.

There are several questions arising upon the present appeal. The bank is dissatisfied with the accounting, claiming, first, that the trial court erroneously allowed the item of $13,160 as damages sustained by the defendant on account of some 500 cattle which the court below found had died of starvation for lack of feed, which it is alleged the bank had refused to furnish. This is the same matter dealt with in the case at law, in which it has been held that this allowance was not justified by the facts. The same view of course must prevail here. That claim will be rejected, and in this respect the decree is found to be erroneous.

The bank also contends that the trial judge erroneously declined to allow the defendant upwards of $10,000 attorney's fees and expenses claimed to have been expended by the bank in prosecuting the litigation. The bank further contends that there was error in the treatment of the $4,712.10, the sum allowed to it for advances for the maintenance of the live stock. This claim was protected by the provisions of the chattel mortgage, but not by the real estate mortgage. It was the contention of the bank in the court below that the credits made in November, 1903, above referred to, upon the note, resulting from the sale of the personal property and cattle, should be used in satisfaction of this $4,712.10, and only the balance thereof applied to the main indebtedness, thus leaving a greater burden upon the real estate than would otherwise exist. The court declined to take this view, and that question is here for consideration.

On behalf of Fritzlen there are the following complaints against the decree: First, because the court erred in its ruling upon his defense that the bank was not authorized, because of a failure to qualify for business in Kansas, to bring the present suit; second, because of the ruling of the court on his defense of illegality in the contract sued on; third, because the trial court refused to allow the credit of $13,160 for damages for the death of the cattle as of the date of the accrual of the loss, or in other words refused to allow interest upon these damages from the date of the loss; fourth, because the trial court allowed the bank a credit of $4,712.10 for advances for maintaining the live stock when this cause of action was barred by the statute of limitations. The two matters last mentioned have been disposed of in the case at law adversely to Fritzlen, and will not be here further considered. The remaining questions will be taken up in succession.

[1] Recurring to the contention of the bank that the trial judge was in error in refusing to allow the bank attorney's fees and expenses in prosecuting the litigation, we have presented to us the provision of the real estate mortgage by which that instrument is declared to protect, not only the particular sum sued for, but "all costs and expenses of enforcing the same as provided by law." The claim here made is that under this provision there should be some $12,000 allowed plaintiff because of the expenses of the extended litigation for the enforcement of the payment of this note. Passing for the time the fact that the great burden of this expense seems to have accrued in the action at law above referred to, rather than in the present proceeding in equity, does the provision of the mortgage just quoted carry in it any obligation for attorneys' fees? This mortgage and note were made in the state of Kansas, to be there performed. Their provisions must therefore be construed in the light of the legislation of that state upon the subject of expenses of litigation and attorneys' fees. There is a statute of Kansas declaring invalid any provision in a mortgage designed to secure the payment of attorney's fees.

This statute in terms precludes a contract for attorney's fees, and it was doubtless in deference to this fact that the note herein sued on contains no such provision. It is sought, however, by the general provision of the mortgage as to expenses, to accomplish that which plaintiff could not have attained by a direct contract. In other words, it is sought to secure by indirection that which the law of the state of Kansas prohibits as a matter of direct agreement. The mortgage, however, must be construed in the light of the Kansas law, and, thus construed, we are of the opinion that its language was not intended by the parties to provide for expenses of litigation outside of the ordinary taxable court costs. Nor are we impressed with the contention that principles of equity dictated the allowance of this amount. No doubt the defendant has been to considerable expense in the conduct of this tedious litigation at law and in equity, but this does not justify an allowance to it, contrary to law, of the expenses of litigation, including attorney's fees. Equity is ancillary, not antagonistic, to the law, and where a statute precludes such an allowance, a court of equity, having due deference to the law, cannot aid in its circumvention.

The case of Dodge v. Tulleys, 144 U. S. 451, 12 Sup. Ct. 728, 36

L. Ed. 501, cited from the Supreme Court of the United States, does not aid the plaintiff. That was a proceeding by a trustee to accomplish by foreclosure the duties of a trust. The court, while recognizing that there was a state statute precluding attorney's fees as such, yet held the trustee entitled to compensation and reimbursement for actual expenses in discharging this trust, and that it was the duty of a court of equity to provide for these. The same was true in Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157. Here, however, we are not dealing with a trustee, nor is the court concerned with any duty to provide for expenses in the discharge of a trust. This is a direct proceeding by the bank against defendant, and in such a proceeding the parties must stand for their respective expenses and attorney's fees; and this is especially true where there is not, and cannot under the state law be, a contract allowing for such.

[2] We come now to the complaint made against the decree below as to the application of the bank's claim for $4,712 awarded it on its second cause of action in the case at law. The court was asked in declaring its accounts, and in marshaling the assets for that purpose, to use the credits upon the note resulting from the sale of the mortgaged cattle and other personal property in satisfying the bank's claim for $4,712. Against this was the contention for Fritzlen, which was sustained by the court, that this $4,712 should be set off against the $13,160 allowed Fritzlen upon his claim for damage. The point made by the bank upon this subject was that this course taken by the court in effect made it simply a general creditor of Fritzlen as to this $4,712, rather than a secured creditor as specifically provided in the chattel mortgage. It is argued that, the $13,160 in favor of Fritzlen being an unsecured claim, it was unequitable to satisfy the $4,712 by offsetting it, a secured claim, against that sum, and that the result of such a process was in effect to make it an unsecured amount, contrary to the terms of the chattel mortgage and the equities of the case. It is argued by the bank that to use these proceeds of November, 1903, in settlement of the claim of $4,712, will be to give the bank the benefit of the mortgaged personalty, and will leave the real estate to respond to the note; whereas, to use the proceeds of the cattle as payment upon the note will be to relegate the $4,712 to the mere contingency of being realized upon execution, and thus be to render it junior to any intervening liens which may have come in upon Fritzlen's property. It is pointed out that to use the cattle in payment of the bank's claim for advances will be equitable, since the money thus advanced went to the protection of the estate for the benefit of all concerned, and the proceeds of the cattle thus benefited, and by the chattel mortgage pledged to this purpose, should be used in declaring the account. It is further pointed out that the lien upon the real property, and that upon the personal property, while conferred by separate instruments, were given contemporaneously, and that the paramount purpose of the transaction was that the indebtedness secured by each should be paid in full. The principle is also urged, citing Field v. Holland, 6 Cranch, 8, 28, 3 L. Ed. 136, that:

"It being equitable that the whole debt should be paid, it cannot be inequitable to extinguish first those debts for which the security is most precarious."

It is finally pointed out that this real estate mortgage does not protect this claim of $4,712, and that this latter, occupying its high equitable status and being specifically provided for in the chattel mortgage, should now be protected by the proceeds of that mortgage, when to hold otherwise would be to make it totally unsecured. As against this it is answered by the defendant that the chattel mortgage in question solves the matter by providing the order in which the proceeds of the cattle were to be used in the payment of the amount secured by the mortgage, and that the order therein prescribed is, first, that the amount shall be used in the payment of the main indebtedness, and, second, to the payment of the advances represented here by this judgment of $4,-712. The trial court, viewing these respective contentions, decided against the bank, and, as has been stated above, by offsetting this $4,712 against the claim of $13,160, in effect made the bank as to this sum, an unsecured creditor. We have held in this and in the law case that there can be no recovery for the $13,160 claimed upon the counterclaim, so that is not now a subject of set-off. The question remains, however, as to whether the amounts derived in November, 1903, from the mortgaged personalty, shall be used as a credit in so far as is necessary in payment of this $4,712.

We are of opinion that this latter course is the proper one. We are of the view that the payment of all indebtedness was in contemplation of the parties when these two mortgages were contemporaneously executed, and that this was the primary purpose of the transaction, and that any course of application of payments which conduces to this end is effectuating the intent of the contracting parties, and is also in accordance with the principles of equity. As against this, the mere fact, much relied upon by Fritzlen, that the chattel mortgage prescribes that this money should be first used to the payment of the note, cannot have controlling weight. Such a provision was intended to state the order of payments in dealing with the chattel mortgage, when viewed and enforced separately, and was intended to accomplish that order of payment and the payment of any balance to the debtor, in the event that this mortgage should be foreclosed. But here we are dealing, upon equitable considerations, with the whole situation. Among other things, we have before us the existence of a contemporaneous real estate mortgage, and the fact that in the protection of the chattel property there has accrued a claim to the bank for a very considerable sum, which is within the very letter of the protection afforded by the mortgage on the personalty. Shall the proceeds of this mortgaged cattle be so used in the accounting as to satisfy this claim, or shall the equities of the claim be ignored, and the claim itself, although originally secured, left for satisfaction by general execution, and thus, perhaps, to no satisfaction at all? We think that equitable principles dictate the application of the proceeds of the personalty to the advances for which it was pledged, rather than that such proceeds shall be carried to the aid of the real estate mortgage equally given in security for the entire main note, and equally pledged to the payment of the latter. We are of the view, therefore, that the court below erred in not so applying the proceeds in November, 1903, from these cattle, so far as these were neces-

sary to satisfy the $4,712 claim. These expressions dispose of all that is urged upon this appeal on behalf of the appellant bank.

[3-5] We come now to that portion of the appeal which deals with the contentions of Fritzlen. These, outside of what has heretofore been treated in the case at law, are as follows: First, there can be no recovery upon the note sued on, for the reason that the bank, which is a Missouri corporation, has never qualified to do business in the state of Kansas, and that it therefore had no power or authority to take the real estate mortgage; second, that the entire note here sued on is void, because at its inception it was in part given in consideration of a commission to the Elmore-Cooper Live Stock Commission Company, which latter was a member of a voluntary association known as the Kansas City Live Stock Exchange, and this commission was charged pursuant to an illegal agreement between members of this organization in restraint of trade, and in violation of the anti-trust laws of the state of Kansas.

The first of these contentions is predicated upon section 2 of chapter 127 of the Kansas Session Laws of 1901. That section is as follows:

"Sec. 2. Every such corporation shall, before being entitled to so take such lien and enforce the same, or any lien now held, shall pay to the secretary of the charter board of this state, created in chapter 10 of the Laws of 1898, a fee of one hundred dollars, and file with such secretary for such board the written consent to be sued and for service of process to be had and made provided in chapter 10, in section 3; and the receipt and certificate of such secretary for such payment and of filing of such written consent shall be received in all cases as sufficient prima facie evidence of compliance with the provisions hereof and of the incorporation of said corporation."

But the act does not declare void a mortgage taken by a foreign corporation, and it is not for the courts to affix a penalty when the Legislature has not seen fit to provide one. Fritts v. Palmer, 132 U. S. 282, 10 Sup. Ct. 93, 33 L. Ed. 317; Blodgett v. Lanyon Zinc Co., 120 Fed. 893, 58 C. C. A. 79. These decisions, one from the Supreme Court of the United States, and the other from this court, have been followed by the Supreme Court of Kansas, which has held, in construing this statute, that a failure to comply therewith does not render the instrument void. Hamilton v. Reeves, 69 Kan. 844, 76 Pac. 418; State v. American Book Co., 69 Kan. 1, 76 Pac. 411, 1 L. R. A. (N. S.) 1041, 2 Ann. Cas. 56. Since, therefore, a failure to qualify under the statute does not affect the instrument, and thus detract from the right, has it any effect upon the remedy, that is to say, upon the right to sue on the instrument involved? We are of opinion that it has not for two reasons: First, any provision against enforcing such a lien, whatever its efficacy as against action in the state courts of Kansas, would not be binding upon the federal courts, and would not preclude suits in the latter tribunals. It is not within the power of the states to limit the jurisdiction of the national courts to entertain a suit. Blodgett v. Lanyon Zinc Co., supra; Butler Bros. Shoe Co. v. United States Rubber Co., 156 Fed. 1, 84 C. C. A. 167. But even if the act of 1901 could be deemed a limitation upon the right to sue upon such a mortgage, and thus as barring the remedy, such barrier had been removed by the express repeal of the entire act before this suit was brought. Section 2

of chapter 153 of the Laws of Kansas of 1903, approved March 13, 1903, in terms provides in its section 1 that foreign corporations may receive, take, sue upon, and otherwise enforce mortgages on lands or other property within the state. Section 2 equally explicitly repeals the act of 1901. This legislation removes the obstacle to the remedy even in the Kansas state courts. Hamilton v. Reeves, supra.

[6] The illegality defense arising out of the anti-trust act may be stated as follows from defendant's amended answer: On November 15, 1899, and thus some two years before the giving of the note sued on, the Elmore-Cooper Live Stock Commission Company was a Missouri corporation engaged in the business of live stock commission merchant, maintaining its principal place of business at the Kansas City Stockyards, situated partly in the state of Kansas, and partly in the state of Missouri; that this commission company at, before, and after November 15, 1899, was a member of a certain voluntary association composed of many persons, partnerships, and corporations engaged principally in the business of buying and selling live stock for others at said stockyards, which association was known as the Kansas City Live Stock Exchange; that substantially all of the business of buying and selling live stock for others at that market was conducted and controlled by said Exchange and its members; that at that time the members of the Exchange, including the Elmore-Cooper Live Stock Commission Company, were parties to an agreement or combination expressed in a certain constitution and in certain by-laws, rules, and regulations by which unlawful restrictions were placed upon the full and free pursuit of the lawful business of purchasing and selling live stock at said market, and within the state of Kansas, and that, among other things, said constitution and by-laws, rules, and regulations provided that members of the association should not charge a less commission than 50 cents per head for buying or selling cattle for others, with a minimum charge of $12 per car load as commission for such purchases or sales; that members of this Exchange should not buy or sell live stock to any one unless such were members of said Exchange, or conformed to the provisions of said governing rules and regulations of the Exchange fixing and controlling said commission charges; that this Exchange did thereby control the live stock commission business conducted at said public market and by these means the members of the Exchange kept and keep in their hands and prevent and restrict competition therein.

The answer further alleges that on or about November 15, 1899, at Kansas City, Kan., the defendant Fritzlen executed and delivered his four nonnegotiable promissory notes, aggregating $19,046.07, payable to the order of said commission company on May 14, 1900, at the Interstate National Bank at Kansas City, Kan; that these notes were dated November 15, 1899, and were in settlement of a pretended balance of the account of said commission company against the defendant, amounting to $18,274.50; that when making up this account, and arriving at said alleged balance, the commission company charged against the defendant, among others, several items, aggregating about $3,000, as and for commissions for services rendered and to be rendered by

said commission company to the defendant in the purchase and sale of cattle theretofore and thereafter to be purchased, shipped, and sold by said commission company; that said commissions were charged in said account at the rate of 50 cents per head for buying cattle, and at the same rate for selling cattle, except that one item of commission of $372 was charged to the defendant by the commission company for services in connection with the purchase of 31 car loads of cattle, said item of $372 being charged to defendant at the rate of $12 per car load; that at the time of the execution and delivery of these four notes the defendant also delivered to the commission company a chattel mortgage covering substantially all the cattle then owned by the defendant, being about 1,100 head, and that among the conditions embodied in the chattel mortgage was one providing that cattle were to be shipped for sale to the commission company, and, when sold, the proceeds thereof were to be applied, first, in payment of the customary commissions for selling, and the balance to be applied to the principal debt; that if the cattle or any part of them were consigned or sold elsewhere, then the mortgagee was to be paid a commission of 50 cents per head on all of the cattle.

It is further averred that the execution and delivery of the notes and of the chattel mortgage took place within the state of Kansas, and said commission charges were made by the commission company and included in said account and in said mortgage for the unlawful purpose, intent, and design on the part of the commission company to promote and carry out the unlawful object and purpose of said combination and agreement entered into by the members of said Exchange, including said commission company, to restrict the full and free pursuit of the business of buying and selling live stock at said stockyards and within the state of Kansas; that by reason of its membership in said Exchange and of its connection with said unlawful combination the commission company had no right to transact any business in the state of Kansas in furtherance or promotion of the object of said combination and agreement; and that by reason of said membership and said connections all persons were prohibited by the laws of the state of Kansas from dealing with said commission company with respect to any business transactions tending to promote or carry out the said unlawful object and purpose of said combination, and that the transaction above mentioned by which the commission company secured the payment to it of the commission charges fixed at the rates agreed upon, as aforesaid, and by which it exacted from Fritzlen a promise to consign live stock to said market and pay the aforesaid rate of commission for services rendered or to be rendered directly promoted and intended to promote and carry out the unlawful object and purpose of said legal combination or Exchange.

The answer further avers that prior to April, 1903, the defendant had no knowledge whatever that said commission company was a party to any such combination, and was up to said date likewise ignorant that said four notes of November 15, 1899, and said chattel mortgage securing same, were given in consideration or grew out of any business transaction violating the Kansas laws relating to unlawful combinations in restraint of trade, and that defendant was without knowl-

edge of any illegality in consideration of said notes and mortgage. It is further alleged that from 1898 to 1902 plaintiff transacted a general banking business at said stockyards in the state of Kansas, being represented at said yards in 1901 by one J. H. Pennell; that after the execution of said four notes and mortgage of November 15, 1899, the commission company, without the knowledge of defendant, pledged them to the plaintiff as collateral security for a pretended loan to said commission company theretofore made by plaintiff bank, which loan was much less in amount than the face of said four notes; that on November 1, 1900, after the maturity of these notes, the defendant Fritzlen, complying with the conditions of the chattel mortgage, shipped 37 head of cattle to said stockyards, consigned to said commission company, which cattle were received and sold on account of defendant by said commission company at said stockyards on November 2, 1900; that without the knowledge or consent of defendant at that time the commission company charged defendant 50 cents per head as commission for selling said cattle and deducted the sum of $18.50 as such commission from the net proceeds of said cattle, which net proceeds, after providing for freight, yardage, and feed, and after deducting therefrom said $18.50 selling commissions at the rate of 50 cents per head, amounted to $1,335.17; that said commission company notified said company of such sale, and that it had credited said sum of $1,-335.17 in part payment of said four notes dated November 15, 1899, but that said commission company gave defendant no notice that said four notes, and the chattel mortgage had been pledged by said commission company to the plaintiff to secure any indebtedness of said commission company to the plaintiff, and that in making said sale of said 37 head of cattle, and making said commission charge, the company acted under and in pursuance of, and to promote, the above-named illegal object and design of said combination Exchange and to promote and carry out the aforesaid illegal agreement in violation of the laws of Kansas; that the commission company remitted to plaintiff said sum of $1,335.17 as a payment on account of indebtedness of the commission company, and the plaintiff accepted said payment well knowing that it had been made to said commission company in the manner aforesaid by defendant, and well knowing that defendant had no knowledge whatever that said four notes and mortgage had been pledged by said commission company to the plaintiff; that in January, 1901, defendant first learned that his notes and mortgage were in the possession of plaintiff, at which time the said Pennell, acting on behalf of both the plaintiff and said commission company, demanded payment of the notes, and defendant was then unable to pay the same without selling the cattle covered by said mortgage, and that Pennell thereupon agreed to accept from defendant a renewal note at 11 months for the amount of said four notes, and to include therein an additional amount of about $10,000 to be advanced to defendant; that at the time of said renewal agreement said four notes and mortgage were the property of said commission company, subject merely to the plaintiff's pledgee lien thereon for the amount of said commission company's debt to the plaintiff of the less amount; that it was agreed by plaintiff and defendant and said commission company that

defendant's renewal note being here sued on should be made payable to Pennell for the benefit of plaintiff and said commission company according to the respective interest therein, and that, when said renewal note was paid by defendant, the plaintiff should be reimbursed for any money advanced on account of the $10,000 advancement above mentioned, balance to be applied to the payment of defendant's four notes of November 15, 1899, said notes meanwhile continuing to be held by the plaintiff under the original pledge agreement of the commission company as collateral security for its debt to plaintiff and that when these four notes were finally paid by the payment of the said renewal note, the plaintiff should retain from the proceeds an amount sufficient to pay said commission company's debt.

It is further alleged that, pursuant to this understanding, defendant executed the note here sued on to Pennell, who on or about December 9, 1901, indorsed over said note without recourse to plaintiff, with full statement of said transaction and accompanied by a statement from said commission company showing its interest therein, and that plaintiff duly accepted said note sued on with full knowledge that the same was executed by defendant to Pennell pursuant to the above-mentioned understanding and not otherwise. It is further alleged that the notes and mortgage of November 15, 1899, were not then or afterwards delivered to defendant, but that these have always been held by plaintiff as property of said commission company, to be paid by defendant when he shall pay said notes sued on, and that the note sued on is held by plaintiff for the benefit of himself and the commission company in accordance with their respective interest as above alleged, and by said agreement the plaintiff is bound to account to said commission company for the amount of said four notes of November 15, 1899, and pay over to said commission company in cash the difference between the amount of said commission company's debt to the plaintiff, and the amount of defendant's said four notes, which difference it is alleged is upward of $1,000. It is further alleged by defendant that, if liable at all, it is only for the valid items of the account in settlement of which said four original notes were by him executed, and that in no event is he liable for said commissions amounting to about $3,000 as above stated.

Upon the basis of the foregoing the defendant avers that plaintiff's cause of action grew out of business transactions in violation of the provisions of the statute of Kansas relating to combinations in restraint of trade. The court sustained exceptions to this portion of the answer as constituting no defense, in a written opinion. Boatmen's Bank v. Fritzlen (C. C.) 175 Fed. 184. The Kansas statute upon which defendant principally relies is, so far as here relevant, as follows:

"Section 1. A trust is a combination of capital, skill, or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them, for either, any or all of the following purposes: First—To create or carry out restrictions in trade or commerce or aids to commerce, or to carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of this state.

"Sec. 2. All persons, companies, or corporations, within this state are hereby denied the right to form or to be in any manner interested, either directly or

indirectly, as principal, agent, representative, consignee or otherwise in any trust as defined in section 1 of this act."

"Sec. 5. Every person, company or corporation within or without this state, their officers, agents, representatives or consignees, violating any of the provisions of this act, within this state, are hereby denied the right, and are hereby prohibited from doing any business within this state, and all persons, companies and corporations, their officers, agents, representatives and consignees within this state are hereby denied the right to  *  *  *  in any manner deal with, directly or indirectly, any such person, company or corporation, their officers, agents, representatives or consignees,  *  *  *;  and all persons, companies and corporations, their officers, agents, representatives or consignees, violating any of the provisions of this section, either directly or indirectly, or of abetting or aiding either directly or indirectly in any violation  *  *  *  of this section, shall be deemed guilty of a misdemeanor and shall be fined  *  *  *  and confined in jail.  *  *  *

"Sec. 6. Each and every person, company or corporation, their officers, agents, representatives or consignees, who, either directly or indirectly, violate any of the provisions of this act shall be deemed guilty of a misdemeanor and on conviction thereof shall be subject to a fine  *  *  *  and shall be imprisoned.  *  *  *

"Sec. 7. Any contract or agreement in violation of any of the provisions of this act, shall be absolutely void and not enforceable in any of the courts of this state, and when any civil action shall be commenced in any court of this state, it shall be lawful to plead in the defense thereof  *  *  *  that the cause of action grows out of any business transaction in violation of this act." Chapter 265, p. 481, Kansas Laws 1897.

The foregoing Kansas law has been the subject of considerable attention from the Kansas courts, and it was held in State v. Wilson, 73 Kan. 343, 80 Pac. 639, 84 Pac. 737, 117 Am. St. Rep. 479, that the Kansas City Live Stock Exchange is an illegal corporation, and that members thereof cannot recover upon notes which include commissions charged pursuant to an illegal regulation of the Exchange binding the members and customers to a uniform charge of 50 cents per head. This decision was not rendered until 1906, and thus not until long after the transaction here involved had been consummated. But, assuming it to be an authoritative interpretation by the Kansas courts of its statutes, is it applicable to a transaction such as this? We are not here dealing with original notes of 1899, or with the parties thereto. Those notes, while held by the plaintiff as collateral security, were superseded and merged into the note here sued on. This latter includes, not only the original indebtedness due the commission company, but also the sum of $10,000 advanced by the bank to Fritzlen. The new note is thus a renewal of the old, and more, since it not only absorbed the former notes, which were to be retired upon its payment, but also afforded defendant a cash resource of $10,000. The note of 1901 to the bank of Fritzlen thus proceeded upon several elements of consideration. It embodied some $10,000 of advances. This certainly was not in furtherance of a violation of the Anti-Trust Act. The rest was to be used by the bank in retiring certain paper of Fritzlen which the bank held as collateral, and which, according to the allegations, did contain the commission precluded by the Anti-Trust Act. That there was this improper element present in the make-up of the collateral notes was not known either to the bank or Fritzlen.

The bank parted with some $10,000 of its money upon the agreement that that amount should be repaid and that the notes it held as col-

lateral should likewise be paid.  It was to get two benefits:  The payment of its advances; the realization upon its collateral.  We think that this was as an entirety a valid arrangement between Fritzlen and the bank.  It was not a contract to carry out restrictions in trade or commerce.  It was a contract for the payment of money it had loaned, and which presumably it loaned in part because and as a result of the transaction it was getting security also to satisfy its collateral. The motive which moved the bank was a perfectly honest and proper one, and had nothing in it violative of the Anti-Trust Act.  It was entirely distinguishable from the motive which according to the contentions actuated the commission company in taking the notes of 1899. It is likewise distinguishable from the Wilson Case, supra, and from Continental Co. v. Voight, 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486, much relied upon by the defendant.

In both of these cases the question was as to the right of a member of an unlawful combination to recover amounts fixed in violation of law.  It was held in the Wilson Case that there could not be a recovery upon the mortgage there involved, because it protected and provided for the collection of an item of commission fixed in violation of the Anti-Trust Act.  In Continental Co. v. Voight the suit was a direct one by a member of the trust to recover where the price sued for was an unreasonable, unjust, and excessive price, owing its existence purely to an unlawful agreement between the plaintiff and others.  In the Wilson Case the question was whether the violator of the law could recover upon such mortgage.  In the Continental Company Case a member of the unlawful combination was suing, and he was suing for the very fruits of the combination, to wit, a price artificially established, not upon meritorious grounds, but purely because members of the combination had agreed that that should be the price.  The distinction between that case and Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 545, 22 Sup. Ct. 431, 46 L. Ed. 679, is pointed out in the Continental Company Case and is here material.  In the Connolly Case a recovery was allowed, although the plaintiff was a member of a trust, and although plaintiff was suing for the purchase price of certain goods constituting the subject-matter of the trust.  Recovery was permitted, however, because there was nothing to show that an artificial condition of prices was being relied upon in the suit, but that, for anything appearing to the contrary, the amount sued for was a perfectly reasonable charge.  It was accordingly held that the enforcement of payment for the goods was not the carrying out of the purposes of any unlawful combination.  In the Continental Company Case, however, as we have seen, there was an allegation that the prices charged were unreasonable, unjust, excessive, and were at least one-half more than they would otherwise have been, but for the prices fixed and attempted to be enforced in the suit there presented.

The court thus held in the Wilson Case and in the Continental Company Case that there could be no recovery; but here the situation is different.  The pleading excepted to does not allege that the commission fixed by the rule of the Exchange was an arbitrary or excessive one, so that the case partakes more of the nature of the Connolly Case, where a recovery was permitted, than of the Continental Company

Case, where a recovery was denied; but the distinction does not stop there. In the present case it is not the violator of the law that is suing. Indeed, the bank is not suing even as the indorsee of the notes of 1899. These were not the property of the bank, save for purposes of security. The true situation was this: Fritzlen in effect said to the bank in 1901:

"I owe the commission company a large sum and you hold those notes as collateral. You want them paid. I want $10,000 in addition. If you will give me the $10,000, I will make you a new note covering the whole sum, part of the proceeds when collected to be used in reimbursement for the advance made me, part in retiring your collateral."

The bank, with no knowledge of any concealed violation of law in the original consideration for the notes held as security, agrees to this, and the new note now sued on is given. The bank, so far as any allegations show, acted in good faith. The punishment of the guilty is a sufficient employment for the courts without extending laws so as to penalize the innocent. It is said, however, that the commission company may, as a result of this, be getting some advantage in that the proceeds of the collateral are to be used, first, in retiring the commission company's indebtedness to the bank, and that any balance from the Fritzlen notes over and above what the commission company owes to the bank will necessarily go to the commission company, and this amount will be upward of $1,000. But this payment to the bank is purely incidental and accidental, and results simply from the fact that the collateral happens to exceed the commission company's indebtedness. Construing the pleadings fairly, the bank's agreement with Fritzlen was not at all in the interest of the commission company, but, as to this branch of the matter, purely in order to realize upon its collateral. The purpose to aid the commission company in collecting an unlawful item of commission was not present as between the parties to the documents of 1901. The commission company, as we have noted, was no party to this. It would, in our judgment, be going a step farther than is justified by any case called to our attention, or any principle of law presented to us, to hold that the note of 1901 is affected by any taint that may have characterized the original indebtedness. The note here sued on is removed from the deadening effect of any violation of the anti-trust statute, by reason of the fact that it was given to a party not belonging to such combination and upon a consideration entirely independent of such combination. The rights of the bank rest upon grounds entirely above and independent of a violation of law. We think that the trial court was under such circumstances right in sustaining exceptions to the defense thus pleaded.

This disposes of the last question raised upon the record and simply leaves for determination the form which the decree must take. The following conditions result from what has been heretofore held:

(a) The payments of November, 1903, are to be utilized, so far as these are necessary, in satisfaction of the sum of $4,712 awarded the bank for the maintenance of the cattle.

(b) Balance of the payments from the sale of cattle will, as in the original decree, be applied to the main indebtedness.

(c) There is to be added the amount of taxes, including principal and interest to April 16, 1910; such sum aggregating $2,058.12 and any taxes paid since that time, with interest.

(d) The claim by Fritzlen for damages for loss of cattle having by stipulation been introduced as an element of the accounting to be made in the present equity cause independent of the verdict of the jury in the law case, and the court being of opinion that the facts proved do not justify the holding of the trial judge in this cause allowing said damages, the decree to be entered below will omit from the accounting thus made the sum of $13,160 allowed Fritzlen for damages.

(e) Fritzlen's claim for damages having been by stipulation submitted as a part of an accounting to be taken in the present cause, and there having been a finding against it, and the testimony being stipulated, with the result that upon a retrial the matter would be presented to the court upon the same record as here, the present cause will not be remanded for further inquiry as to Fritzlen's right of recovery for damages.

(f) A decree will run for the foreclosure of the real estate mortgage for the payment of the amounts resulting from the foregoing findings.

(g) Since the conclusion in the present cause as to Fritzlen's claim for damages constitutes a final adjudication of the matter adversely to him, another trial in the suit at law would, upon principles of res adjudicata, be of no avail. The decree to be entered in the present cause will accordingly enjoin any further prosecution by Fritzlen of his counterclaim against the bank.

The decree rendered by the court below will be reversed, and the cause remanded, with instructions to enter a decree in accordance with this opinion.